## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James Holverson,

        Plaintiff,

    v.

ThyssenKrupp Elevator Corporation f/k/a
Thyssen Elevator Company f/k/a
Thyssen Dover Elevator Company f/k/a
Dover Elevator Company; ThyssenKrupp Elevator
Manufacturing, Inc. f/k/a Thyssen Elevator
Systems, Inc. f/k/a Dover Elevator Systems, Inc.;
ThyssenKrupp Elevator Americas Corporation;
ThyssenKrupp Elevator Capital Corporation;
LQ Bloomington, LLC d/b/a LaQuinta
Inn & Suites, and LQ Management, LLC d/b/a
LaQuinta Inn & Suites,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-2765 ADM/FLN

_____

L. Michael Hall, III, Esq., Hall Law, PA, St. Cloud, MN, on behalf of Plaintiff.

Michael W. Haag, Esq., Janet Stellpflug, Esq., Kyle A. Eidsness, Esq., and Joanna M. Salmen, Esq., Foley & Mansfield, Minneapolis, MN, on behalf of the ThyssenKrupp Defendants.

Mark A. Solheim, Esq., and Anthony J. Novak, Esq., Larson King, LLP, Minneapolis, MN, on behalf of LQ Bloomington, LLC, and LQ Management, LLC.

_____

## I. INTRODUCTION

On May 16, 2014, the undersigned United States District Judge heard oral argument on

Defendants ThyssenKrupp Elevator Corporation, ThyssenKrupp Elevator Manufacturing, Inc.,

ThyssenKrupp Elevator Americas Corporation, and ThyssenKrupp Elevator Capital

Corporation's (together, "ThyssenKrupp") Motion to Dismiss, or, Alternatively, for Summary

Judgment [Docket No. 165], Motion to Exclude Expert Testimony of Thomas Branham [Docket

No. 161], and Motion to Strike the Deposition Errata Sheet of Thomas Branham [Docket No.

185].  Defendants LQ Bloomington, LLC and LQ Management, LLC (together, "LaQuinta") join

in support of ThyssenKrupp's expert motions [Docket No. 169].  Plaintiff James Holverson

("Holverson") opposes all three of Defendants' motions.  For the reasons stated herein,

Defendants' motion for summary judgment is granted.   Defendants' motion to exclude the

expert testimony of Thomas Branham is granted in part, and the motion to strike Branham's

errata sheet is denied.

## II.  BACKGROUND

On or about November 15, 2008, Plaintiff Holverson was staying at the LaQuinta Inn &

Suites in Bloomington, Minnesota.  Compl. [Docket No. 1] ¶ 26.  A hotel elevator allegedly

lurched upwards as Holverson exited, causing him to fall and fracture his hip.  Holverson

underwent several hip surgeries and related complications, and alleges ongoing disability due to

his injury.  Id. at 26-28.

Holverson filed suit on October 30, 2012.  He alleges three primary theories of liability:

(1) Defendants negligently maintained the elevator; (2) ThyssenKrupp negligently designed and

manufactured the elevator; and (3) ThyssenKrupp failed to warn the public about the elevator's

risk of injury.  Compl. ¶¶ 29-39.  In the Complaint, Holverson also alleges an additional design

defect claim for the elevator's generator brushes, as well as a claim for premises liability.  Id. ¶¶

40-50.  Holverson makes no attempt to address, let alone defend, the latter two claims, so they

are deemed abandoned.  See, e.g., Ehlers v. Siemens Med. Solutions, USA, Inc., 251 F.R.D. 378,

383 (D. Minn. 2008) (finding plaintiff abandoned product liability claim after failing to defend

it).

## III.  DISCUSSION

### A.  Motion to Dismiss or for Summary Judgment

#### 1.  ThyssenKrupp Americas Corp. and ThyssenKrupp Elevator Capital Corp.

In their motion, Defendants argue ThyssenKrupp Americas Corporation and ThyssenKrupp Elevator Capital Corporation should be dismissed.  The text of the Complaint, Defendants argue, makes clear that Holverson alleged liability in overly broad strokes, and discovery has since clarified that these two Defendants played no role in Holverson's injury.  In his response, Holverson agrees to dismiss these entities.  See Pl.'s Mem. Opp'n Summ. J. [Docket No. 173] ("Pl.'s Summ. J. Opp'n") at 2.  As a result, ThyssenKrupp Americas Corporation and ThyssenKrupp Elevator Capital Corporation are dismissed from this action.

#### 2.  ThyssenKrupp Elevator Manufacturing, Inc.

ThyssenKrupp moves for the dismissal of only one of the two remaining entities: ThyssenKrupp Elevator Manufacturing, Inc. ("ThyssenKrupp Manufacturing").[1]  See Defs.' Mem. Supp. Mot. Dismiss [Docket No. 167] at 3.  ThyssenKrupp argues ThyssenKrupp Manufacturing should be dismissed: (1) as a matter of law for a failure to prosecute under Rule 41(b) of the Federal Rules of Civil Procedure; or (2) as a matter of summary judgment, because Holverson has failed to demonstrate a genuine issue of fact as to his product liability claims.

##### a.  Failure to Prosecute

ThyssenKrupp argues Holverson has failed to prosecute his product liability and failure to warn claims, meaning the claims should be involuntarily dismissed.  Under Rule 41(b), a

---

[1]  The other entity, ThyssenKrupp Elevator Corporation, is a wholly-owned subsidiary of ThyssenKrupp Elevator Americas Corporation.  ThyssenKrupp Elevator Corporation maintained the elevator at issue.  See Michael W. Haag Aff., Mar. 14, 2014 [Docket 168] Ex. 1, ¶¶ 14-16.

3

defendant may move to dismiss a claim if "the plaintiff fails to prosecute or to comply with these rules or a court order."  ThyssenKrupp argues Holverson failed to comply with the Court's scheduling order when it did not disclose a products liability expert.  As a result, ThyssenKrupp seeks the involuntary dismissal of Holverson's product liability claims.

The sufficiency of a party's evidence is not a matter for sanctions.  Eighth Circuit courts have consistently viewed a Rule 41(b) dismissal with prejudice as a "drastic and extremely harsh sanction[]" reserved for egregious failures to meet deadlines or comply with court orders. Bergstrom v. Frascone, 744 F.3d 571, 575 (8th Cir. 2014).  These failures have included, for example, when a plaintiff engaged in a three year pattern of delay, or when a plaintiff attempted to "play games" with the court and ultimately did not appear for trial.  Skelton v. Henry, 390 F.3d 614, 617 (8th Cir. 2004); DuBose v. State of Minn., 893 F.2d 169, 171 (8th Cir. 1990). Here, the existence of an expert disclosure deadline did not impose on Holverson any affirmative duty to hire an expert.  Consequently, his decision not to hire a product liability expert does not qualify as a violation of a court order, let alone as conduct warranting dismissal with prejudice. The sufficiency of Holverson's product liability evidence is properly considered as an issue for summary judgment.

### b.  Summary Judgment

A motion to dismiss under Rule 12(b)(6) "must be treated as a motion for summary judgment when matters outside the pleadings are presented and not excluded by the trial court." Woods v. Dugan, 660 F.2d 379, 380 (8th Cir. 1981).  The parties in this case have submitted evidence outside of the pleadings.  In addition, Holverson had notice that this motion could be converted to one for summary judgment, and he had the opportunity to respond appropriately.

As a result, the present motion is addressed as one for summary judgment.  Gibb v. Scott, 958

F.2d 814, 816 (8th Cir. 1992).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be granted if there exists no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law.  The United States Supreme Court, in construing Federal Rule

56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

However, the nonmoving party may not "rest on mere allegations or denials but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  A plaintiff facing a summary

judgment motion cannot "get to a jury without any significant probative evidence tending to

support the complaint."  Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

ThyssenKrupp argues Holverson's product liability and failure to warn claims must be

supported by expert testimony.  Relying on decisions from this circuit, ThyssenKrupp argues

expert testimony is needed when the technology or nature of the design at issue goes beyond the

general knowledge and experience of the average juror.  See, e.g., Mozes v. Medtronic, Inc., 14

F. Supp. 1124, 1127-28 (D. Minn. 1998).  ThyssenKrupp argues the subjects of elevator

component design and the way in which defective design might cause injury are both complex

and therefore require expert testimony.  Similarly, the effect of a technically-detailed warning requires expert testimony to demonstrate its effect on the average elevator user.

Holverson argues expert testimony is not necessary, but even if it is, ThyssenKrupp's own expert has provided sufficient support for the product liability claims.  In his supplemental report, ThyssenKrupp's expert John Donnelly opined that "the incident as described by the Plaintiff could not have happened."  L. Michael Hall Aff., Apr. 4, 2014 [Docket No. 175] ("Hall SJ Aff.") Ex. 2 ("Donnelly Supp. Report") at 4.  However, Donnelly further stated that if he assumed Holverson's version of events, the incident likely occurred due to a "transient problem with an electro-mechanical component of the elevator system," a problem "which could occur in any elevator system," and which is in "the nature of electro-mechanical systems, such as elevators."  Id. at 4.  Donnelly testified to this effect in his deposition as well.  Hall SJ Aff. Ex. 3. Based on this analysis, Holverson argues ThyssenKrupp has "admitted" that the elevator at issue had a design defect "that [Donnelly] believes was probably the cause of the accident."  Pl.'s Summ. J. Opp'n at 15.  Thus, it is argued the only question is whether the design was unreasonably dangerous, a question Holverson states is typically reserved for the jury, and a subject on which Holverson's expert, Thomas Branham, has testified.

Although expert testimony is not required in every product liability case involving a complex product, expert testimony is required here.  In Mozes, the primary case relied upon by ThyssenKrupp, the court held that it was not aware of any blanket rule requiring the use of expert testimony in product liability cases.  Nevertheless, the court concluded the devices at issue—pacemakers and pacemaker leads—were sufficiently complex that failing to require expert testimony would force the jury to speculate as to whether the plaintiff had adequately

proved his design defect claim.  Mozes, 14 F. Supp. 2d at 1128.  In reaching this decision, the court relied in part on comparable Minnesota precedent governing negligence claims.  See id. (citing Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co., 366 N.W.2d 271, 279 (Minn. 1985)). Several other decisions of this district have adopted the reasoning in Mozes.  See, e.g., Nelson v. Navistar Int'l Corp., No. 10-137, 2011 WL 5374438, at *4-5 (D. Minn. Nov. 7, 2011); Rousu v. Rubbermaid Commercial Prods., LLC, No. 09-1987, 2011 WL 884125, at *6 (D. Minn. Mar. 14, 2011); Becerra Hernandez v. Flor, No. 01-183, 2002 WL 31689440, at *10 (D. Minn. Nov. 29, 2002).

Although the passenger controls of an elevator are fairly simple—literally "a touch of a button"—the design of the electric and mechanical systems allowing an elevator to function are beyond the knowledge of an average person.  This conclusion is supported by the record.  Both parties' elevator maintenance experts delve into the operation of commutators, electric motors, and their related components.  A juror is unlikely to be familiar with these components.  Also as discussed below, elevators require these components to interact in a somewhat complex manner to ensure timely and consistent performance.  Without expert testimony, the fact-finder would be "forced to speculate" as to whether Holverson had proven his product liability claims.

Holverson's product liability claims are dismissed.  Holverson concedes he did not identify a relevant expert witness either before or after the expert disclosure deadline.  His attempt to rely on ThyssenKrupp's expert witness does not cure this deficiency.  Holverson overlooks Donnelly's primary conclusion that the alleged incident could not have happened as Holverson has described it.  Donnelly opined only in the hypothetical regarding Holverson's version of events, and even then only testified that "transient" errors might be possible, but that

these errors are necessarily a part of all elevator systems and not just the elevator at issue.

Defense expert Donnelly's opinion does not address whether the elevator was "unreasonably dangerous" for its intended use.  To recover on a strict product liability claim, a plaintiff must demonstrate the product was in a "defective and unreasonably dangerous" condition.  Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 623 n.3 (Minn. 1984).  In considering whether a product is unreasonably dangerous, Minnesota courts employ a "reasonable care balancing test."  Id. at 622.  In almost every case, this includes considering whether a "feasible, alternative safer design" existed.  Kallio v. Ford Motor Co., 407 N.W.2d 92, 95-96 (Minn. 1987).[2]  Holverson cites no expert testimony of record demonstrating a feasible, safer elevator design.  Indeed, Donnelly's own opinion, that transient errors are inevitable in all elevator systems, precludes the conclusion that a safer design existed.  As a result, Holverson has not demonstrated viable product liability claims.

Holveron's failure to warn claim must also be dismissed for want of evidence.  A negligent failure to warn claim has three elements: "(1) whether there exists a duty to warn about the risk in question; (2) whether the warning given was inadequate; and (3) whether the lack of a warning was a cause of plaintiff's injuries."  Seefeld v. Crown, Cork & Seal Co., Inc., 779 F. Supp. 461, 464 (D. Minn. 1991) (citing Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987)).  Whether a duty to warn exists about a product's alleged danger depends on "the resulting injury's foreseeability," and is generally determined as a matter of law.  Westbrock v.

---

[2]  Despite Holverson's arguments to the contrary, "only in rare cases do defective-design claims succeed without showing a safer design."  Young v. Pollock Eng'g Grp., Inc., 428 F.3d 786, 789 (8th Cir. 2005).  These rare cases involve products so dangerous they should be "removed from the market rather than be redesigned."  Kallio, 407 N.W.2d at 97 n.8.  Holverson does not argue for the prohibition of all elevators, nor did Donnelly opine to that effect.

Marshalltown Mfg. Co., 473 N.W.2d 352, 358-59 (Minn. Ct. App. 1991).  As discussed above, Holverson has not demonstrated that a dangerous condition existed in the elevator at issue. Holverson's only evidence of a dangerous condition stems from Donnelly's "transient problem" testimony, but Holverson has offered no evidence that the "transient problem" was reasonably foreseeable or even whether the problem actually caused Holverson's injury.  Without such evidence, Holverson has failed to establish a duty to warn.

In addition to his above arguments, Holverson's counsel, L. Michael Hall ("Hall") submits an affidavit under Rule 56(d) requesting a delay in consideration of the summary judgment motion.  Hall testifies Holverson has not yet determined whether the elevator at issue had a design defect because Hall has not yet had the opportunity to depose a corporate representative of ThyssenKrupp Manufacturing.  Hall SJ Aff. ¶ 6.  Hall states ThyssenKrupp misrepresented which entity designed and manufactured the elevator, causing a delay in scheduling the deposition.  Hall eventually moved to compel the deposition, a motion which Magistrate Judge Franklin L. Noel granted on April 3, 2014.  Order, Apr. 3, 2014 [Docket No. 170].  Holverson argues that only upon the completion of this deposition will he know whether the elevator had a design defect, and whether ThyssenKrupp knew about the defect and took steps to minimize or design around it.[3]  Hall SJ Aff. ¶ 10.  Until then, summary judgment is premature.

Holverson has not demonstrated how delaying a decision on summary judgment would

---

[3]  Contrary to Hall's statements here, in his memorandum opposing the exclusion of expert Thomas Branham's opinions, Holverson argues "the evidence strongly suggests" ThyssenKrupp's negligent maintenance of the elevator caused his injury.  Pl.'s Opp'n to Mot. Exclude Expert [Docket No. 171] at 4.

alter the outcome.  To be clear, Hall did not aver in his Rule 56(d) affidavit that some turn of

events prevented Holverson from retaining an expert to inspect the elevator's design and

manufacture for potential defects.  Instead, Holverson argues summary judgment should be

delayed so that he can depose the manufacturer's corporate representative.  Further, Judge Noel

limited this deposition to one topic, which concerns only the foreseeability of the alleged

"lurching malfunction."  Order, Apr. 3, 2014 at 2; L. Michael Hall Aff., Feb. 17, 2014 [Docket

No. 114] Ex. 3.  Thus, even if Holverson conducts or has conducted this deposition, this

evidence could not satisfy all of the elements of a product liability claim.  Nor would the

deposition change Holverson's failure to procure expert testimony.[4]  ThyssenKrupp's motion for

summary judgment is granted, and Holverson's product liability claims are dismissed.

## B. **Daubert** Motion

### 1. **Standard**

Next, ThyssenKrupp moves to exclude the opinions of Thomas Branham, Holverson's

only designated expert witness.  LaQuinta joins in ThyssenKrupp's motion [Docket No. 169].

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  The

rule states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge

---

[4] Even if expert testimony were not required, Holverson's product liability claims would still fail.  The only non-expert evidence Holverson cites in support of his product liability claims is the testimony Holverson hopes to obtain through the aforementioned Rule 30(b)(6) deposition. See Pl.'s Summ. J. Opp'n at 17.  Given the limits placed on this deposition by Judge Noel, Holverson has not shown how he will be able to demonstrate a plausible product liability claim.

> will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 reflects but does not codify the holding of <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), and the cases interpreting <u>Daubert</u>, including <u>Kumho Tire Co. Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory committee's note.

In addition to Rule 702, trial courts may consider several factors set out by <u>Daubert</u> for determining reliability, including: (1) whether the theory can be (and has been) tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys general acceptance in the relevant scientific community.  <u>Daubert</u>, 509 U.S. at 593-94.  Courts have also considered whether "the expertise was developed for litigation or naturally flowed from the expert's research."  <u>Lauzon v. Senco Prods., Inc.</u>, 270 F.3d 681, 687 (8th Cir. 2001).  No single <u>Daubert</u> or Rule 702 factor is determinative.  Instead, the trial court must evaluate reliability in a flexible manner, as the <u>Daubert</u> factors may not necessarily apply "to all experts or in every case."  <u>Kumho</u>, 526 U.S. at 141.  Thus, the trial court has broad discretion not only in ultimately determining reliability, but also in <u>how</u> it determines reliability of an expert.  <u>Id.</u> at 142.

Rule 702 "reflects an attempt to liberalize the rules governing the admission of expert testimony."  <u>Lauzon</u>, 270 F.3d at 686.  The trial court should generally resolve doubts about the usefulness of an expert's testimony in favor of admissibility.  <u>Marmo v. Tyson Fresh Meats, Inc.</u>,

457 F.3d 748, 758 (8th Cir. 2006).   "Only if the expert's opinion is so fundamentally

unsupported that it can offer no assistance to the jury must such testimony be excluded."  Bonner

v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001).

### 2.  Qualifications

Branham has worked in the elevator industry in several capacities for about 40 years.  L.

Michael Hall Aff., Apr. 4, 2014 [Docket No. 172] ("Hall Expert Aff.") Ex. 22.  Branham, a

certified elevator inspector, owned and operated an elevator installation and repair company for

about 13 years.  He also belongs or has belonged to numerous trade and political associations

related to elevators.  Id.  For the past 16 years, Branham has owned an elevator consulting

company, which evaluates elevators, audits maintenance reports, conducts investigations, and

provides expert testimony.  Id. Ex. 13 ("Branham Initial Report") at 14-15.

### 3.  Maintenance Opinions

The thrust of Branham's opinions relate to the elevator at issue's electric generator.  See

Branham Initial Report at 2.  The generator includes a commutator: a cylindrical device made of

copper bars.  Around and in contact with the commutator are soft carbon "brushes."  The brushes

are pushed into contact with the commutator through small "brush springs."  See Hall Expert

Aff. Ex. 14.  When the commutator spins, it directs a continuous flow of electricity from the

generator, through the brushes, and out to the elevator's motor through metal leads.  Id.;

Branham Initial Report at 2.  The flow of electricity from the commutator through the brushes is

known as commutation.  Id.

In his report, Branham concludes that the "lurching malfunction" which caused

Holverson's injury was the result of poor commutation.  Proper commutation occurs when

electricity continuously and consistently flows from the generator to the elevator motor through the generator brushes, which in turn powers the elevator normally.  Poor commutation occurs when the flow of electricity has irregularities due to a poor connection between the commutator and the motor.  These irregularities can lead to "surges and delays," which in turn power the motor unevenly.  Id.

Branham opines that poor commutation caused the alleged lurching incident, and that the poor commutation was the result of inadequate maintenance.  Generator brushes wear down over time due to their contact with the commutator, meaning the brushes may reach a point at which they are too short to effectively direct electricity.  Hall Expert Aff. Ex. 16 ("Donnelly Dep.") at 251.  At that point, "arcing" may occur, meaning electricity may jump "through the air from the commutator to the brush."  See Hall Expert Aff. Ex. 25 ("Branham Final Report") at 4.   This "jumping" may lead to uneven flow of current.  In addition, the brush springs used to keep the generator brushes in place must be maintained at sufficient tension, otherwise, again, proper contact fails to occur.  See id. at 1, 8.  Branham theorizes two problems occurred: (1) poor commutation delayed the elevator from properly lining up with Holverson's destination floor, leaving it below-level; and (2) when the elevator attempted to automatically re-level by increasing power, poor commutation led to an over-compensating power surge, resulting in a lurch upward.  See Branham Final Report at 4.

LaQuinta contracted with ThyssenKrupp Elevator Corporation for regular maintenance of the elevator.  See Michael W. Haag Aff., Mar. 14, 2014 [Docket No. 168] ("Haag SJ Aff.") Ex. 1, ¶ 15.  Based on industry standards, Branham avers the elevator at issue should have undergone routine preventative maintenance including generator inspections once a month and inspection of

the commutator and brushes every three months.  Branham Final Report at 8.  Branham's review

of ThyssenKrupp's maintenance logs reflects "inadequate" maintenance, both in terms of

maintenance visits per month and the duration of each visit.  Id. at 2, 8.  In particular, Branham

finds ThyssenKrupp did not maintain the elevator for over three months immediately before

Holverson's injury.  Id. at 8.  Based on the failure of maintenance, Branham identifies two

possible sources of poor commutation.  First, ThyssenKrupp allowed multiple brushes in the

elevator to wear down to below half their original length.  While one brush may safely wear

down by half, allowing several to do so at once "is not acceptable."  Id. at 4-5.  Second, Branham

states ThyssenKrupp failed to check the brush spring force every third or fourth brush change, as

should be standard.  This failure may have additionally caused poor commutation.  Id. at 1, 4-5.

ThyssenKrupp argues for the wholesale exclusion of Branham's opinions because

Branham relied on incomplete data.  During the time at issue, ThyssenKrupp assigned elevator

mechanic Jamie Carr to perform maintenance on the LaQuinta elevator.  As evidence of some of

Carr's maintenance visits, LaQuinta produced customer service tickets.  Carr also created "time

tickets" to document his time spent on preventative maintenance, as well as a diary further

reflecting dates and times of service visits.  See Janet G. Stellpflug Decl., Mar. 14, 2014 [Docket

No. 164] Ex. C ("Branham Dep.") at 158-59.[5]  Although Branham reviewed maintenance log

data in reaching his conclusions, he did not review any of the time records reflecting additional

maintenance.  Id.  ThyssenKrupp also argues Branham bases his opinions in part on an

inspection he conducted and photographs he took in 2013, even though the incident at issue

---

[5] For reasons stated below, Branham's errata sheet to this deposition is not considered
part of the summary judgment record.

occurred in 2008.  Branham Dep. 151-52, 345-46.  Due to these infirmities in the information he considered, ThyssenKrupp argues, Branham's opinions are necessarily flawed.

Holverson responds that Branham considered sufficient information to reach his conclusions, and that much of ThyssenKrupp's identified data is duplicative.  Branham reviewed maintenance log entries as well as the testimony of several ThyssenKrupp employees.  See Branham Final Report at 9; Pl.'s Opp'n to Mot. Exclude Expert [Docket No. 171] ("Pl.'s Expert Opp'n") at 31-32.  This evidence provides much of the same information ThyssenKrupp now claims Branham failed to consider.  Additionally, Holverson argues Branham's overall conclusions remain sound despite the supposedly new data: for example, ThyssenKrupp does not contest that it reduced its maintenance from about four hours to two hours per month.  See Pl.'s Expert Opp'n at 30.  Finally, Holverson argues ThyssenKrupp's position is disingenuous because ThyssenKrupp failed to produce the time records until late in the litigation.

Despite ThyssenKrupp's attempts to characterize Branham's maintenance opinions as speculative, he has not so thoroughly failed to consider the evidence to warrant exclusion of his opinion.  The record shows Branham inspected the elevator, reviewed previous inspections, and reviewed the testimony of several ThyssenKrupp employees who performed preventative maintenance on the elevator at issue.  See Branham Final Report at 3-4, 9; Branham Dep. 301-311; Hall Expert Aff. Ex. 29 ("Branham Audit Report").  In addition, Branham reviewed maintenance log entries for at least a significant part of the relevant timeframe.[6]  Branham also

---

[6]  At oral argument, counsel for ThyssenKrupp argued Branham reviewed a summary of maintenance logs created by Hall.  Hall argued that the summary accurately summarized voluminous records, and he made the underlying documents available to Branham.  For purposes of this Daubert motion, Branham's review of records is sufficient but such a methodology of expert review is not encouraged and should not be replicated in the future.

reviewed several applicable maintenance standards, including the standards published by the American Society of Mechanical Engineers ("ASME") and the guidelines originally set by ThyssenKrupp's predecessor company.  See Branham Final Report at 8-9; Hall Expert Aff. Ex. 21.  As a result, the exclusion of Branham's opinions based solely on his failure to consider specific documents is unwarranted.  ThyssenKrupp may explore any deficiencies through cross-examination at trial.

Next, ThyssenKrupp argues the Court should exclude Branham's opinions because Branham failed to conduct testing of the elevator at issue, and because his opinions regarding maintenance are not accepted in the industry.  Apart from riding the elevator several times during his February 2013 inspection, ThyssenKrupp argues Branham failed to perform any testing whatsoever to recreate the "surges and delays" that supposedly result from poor commutation.  With regard to his maintenance opinions, ThyssenKrupp argues Branham imposes maintenance standards so rigorous that no company in the industry adheres to them.  For instance, Branham conceded that his consulting company's recommendation for four hours of monthly maintenance has not been adopted by any elevator company that publishes similar standards.  See Branham Dep. 359-60.  Because his opinions are untested and not widely accepted, ThyssenKrupp again seeks their exclusion.  See Daubert, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible . . . .").

These arguments do not warrant the exclusion of Branham's opinions.  The key focus in conducting a Daubert analysis is on the expert's methodology, and not his results.  Branham's failure to conduct specific testing of his poor commutation theory weighs against its

admissibility, but a lack of testing does not justify automatic exclusion of his opinion.  Evidence

corroborates several aspects of Branham's theory.  Branham opines that worn generator brushes

could result in poor commutation, which may be reflected in part by the "arcing" of electricity.

Branham Final Report at 1.  As the state inspector noted in his report, "the generator brushes

were a little less than 1/2," which he observed as "causing arcing and poor commutation."  Id. at

4.  Similarly, Branham opines that low spring tension contributed to the poor commutation.

Again, the state inspector noted after Holverson's injury that ThyssenKrupp had equipped the

elevator with the wrong brush springs, leaving spring tension low.  See Hall Expert Aff. Ex. 9

("Floren Dep.") at 40-41.  ThyssenKrupp's own employee noted low spring tension as well.

Branham Final Report at 4 (citing maintenance log of ThyssenKrupp employee in November

2008 about low spring tension).  Finally, Branham's opinion about poor commutation causing

the accident is based on accepted mechanical engineering principles, none of which

ThyssenKrupp disputes.

In addition, Branham's failure to test his theory does not mean his theory is untestable,

which would present a more significant weakness.  Under Daubert, the "testability" of a theory is

critical to its admissibility, as "falsifiability, or refutability, or testability" is necessary to discern

valid scientific opinions.  See Daubert, 509 U.S. at 593 (citation omitted).  Here, although

Branham failed to test his poor commutation theory, ThyssenKrupp's expert Donnelly did.  See

Michael W. Haag Decl., Apr. 18, 2014 [Docket No. 182] Ex. E ("Donnelly Dep.").  Donnelly

tested several scenarios that might result in poor commutation, but failed to reproduce the

"surges and delays" Branham theorized.  Id.  The record indicates Branham based his opinions

on extensive experience and undisputed mechanical engineering principles, and that his theory

was indeed testable. What conclusions should be drawn from Donnelly's testing of that theory is a matter for the factfinder.

Further, the lack of concurrence with Branham's testimony about maintenance standards does not warrant its exclusion. The Supreme Court in <u>Daubert</u> discussed "general acceptance" of a theory as relevant to, but not determinative of, an opinion's admissibility. It should be noted, however, that <u>Daubert</u> discussed the acceptance of scientific theories by the scientific community; whether an opinion as to an industry safety standard is publicly accepted by profit-driven companies can be quite another matter. <u>See</u> <u>Daubert</u>, 509 U.S. at 594. Branham testified that while elevator companies no longer state a minimum for maintenance hours, most elevator consultants make such minimums a part of their service contracts. Branham Dep. 359-60. That ThyssenKrupp and other elevator manufacturers no longer state minimum maintenance requirements for their elevators is a likely subject for ThyssenKrupp to explore at trial. Holverson may similarly explore why these companies may have chosen to stop publicly publishing such maintenance standards. Whether Branham's opinions are unreasonable or unwarranted will be for the factfinder to consider.

### 4. Product Liability Opinions

In addition to his maintenance and causation opinions, ThyssenKrupp moves for the exclusion of Branham's product liability opinions. Because summary judgment was granted on Holverson's product liability claims, Branham's limited product liability opinions need not be addressed.[7]

---

[7] Even when considered, such opinions would still be excluded because Branham's product liability opinions are incomplete and conclusory. Branham opines that if an elevator "was prone to this type of malfunction," it would be unreasonably dangerous to sell the elevator

**C.  Motion to Strike Errata Sheet**

With its final motion, ThyssenKrupp moves to strike Branham's deposition errata sheet from the record.  Branham produced one audit report and three expert reports in connection with this case.  In February 2013, Branham inspected the elevator at issue and prepared his audit report.  In November 2013, Branham produced an initial expert report.  In neither report did Branham describe experiencing any issues during his rides on the elevator in question.  See Branham Audit Report; Branham Initial Report.  Then on December 31, 2013, Branham issued a rebuttal report in response to Donnelly's expert report.  Hall Expert Aff. Ex. 23 ("Branham Rebuttal Report").  In the rebuttal report, for the first time, Branham described experiencing "oscillation" during his February 2013 inspection.  Id. at 1.  But shortly thereafter, in his final expert report issued on February 14, 2014, Branham made no mention of experiencing oscillation.  See Branham Final Report.

On February 20, 2014, ThyssenKrupp deposed Branham.  During his deposition, Branham apparently became confused about what happened during his February 2013 inspection.  Branham explained that he normally takes a standard document with him for inspections, and then asks his staff to create an audit report based on his notes.  See Branham Dep. 106.  During the deposition, Branham appeared certain he had experienced oscillation during his inspection, and that either his staff had made an error or that he had retrieved the

_____

on the market.  See Pl.'s Expert Opp'n at 47.  This opinion differs from Branham's opinions about poor commutation because it is largely circular and has no reliable basis in the record.  In essence, Branham opines that Holverson's injury occurred, therefore the elevator's design must be unreasonably dangerous.  ThyssenKrupp correctly argues that such an opinion exists only by the ipse dixit of the expert.

wrong audit document.  Id. at 106-07.  During the deposition, Branham took a copy of his audit

report and actually changed it by hand to indicate that he had experienced the same sort of

"lurching malfunction" that had caused Holverson's injury.  See id.

On February 26, 2014, Hall received the read and sign letter and errata sheet from the

court reporter for Branham's deposition.  On March 31, 2014, Branham executed his errata

sheet.  The errata sheet states 68 corrections to his deposition over a dozen pages.  Hall Expert

Report Ex. 28 ("Errata Sheet").  A plurality of the corrections—about 25—alter Branham's

testimony about what he experienced during his February 2013 inspection.  In the corrections,

Branham explains that he conducts "hundreds of inspections each year," and that he confused the

inspection in this case with a different inspection.  As a result, Branham's errata sheet states he

did not experience any problems, including oscillation, during his inspection of the elevator in

question.  Id.  Of the remaining deposition corrections, several substantively change answers

with the benefit of hindsight and research.  See, e.g., Errata Sheet ¶ 13.  The remainder of

Branham's changes attempt to correct misstatement or errors in spelling.  See, e.g., id. ¶ 8

(correcting "ECI" as "ECS").

ThyssenKrupp argues Branham's errata sheet is untimely.  Rule 30(e) states a deponent

must be allowed "30 days after being notified by the officer that the transcript or recording is

available" in which to review his deposition and submit an errata sheet reflecting "changes in

form or substance" to the deposition.  By ThyssenKrupp's count, Branham had only until March

27 to sign his errata sheet, which he failed to meet when he signed his errata sheet on March 31.

The Court disagrees with ThyssenKrupp's deadline calculation.  Under Rule 6(a), Branham's 30

day period began running on February 27, and ended on March 31, meaning the execution was

timely.  See Fed. R. Civ. P. 6(a).

More significantly, ThyssenKrupp argues that Branham's errata sheet unfairly and

improperly alters the substance of his deposition testimony.  ThyssenKrupp argues both Hall and

Branham had numerous opportunities to correct Branham's statements about experiencing

oscillation, but instead waited until after ThyssenKrupp had filed its Daubert motion, thereby

maximizing the unfair prejudice caused to Defendants.  Citing federal decisions from several

jurisdictions, ThyssenKrupp argues courts have stricken errata sheets to prevent deponents from

artfully revising their answers.  See, e.g., Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325

(W.D. La. 1992) ("A deposition is not a take home examination.").

The Court previously addressed this issue in Sanny v. Trek Bicycle Corp., No. 11-2936,

2013 WL 1912467, at *12-14 (D. Minn. May 8, 2013).  As discussed in that decision, some

courts have held against allowing substantive changes in an errata sheet, while other courts have

allowed them.  Id.; see also Norelus v. Denny's, Inc., 628 F.3d 1270 (11th Cir. 2010) (collecting

cases).  The Eighth Circuit Court of Appeals has not yet ruled on whether an errata sheet may

substantively change a deposition.

The flexible approach set forth by the Third Circuit Court of Appeals provides an

appropriate balance between fairness and efficiency.  See EBC, Inc. v. Clark Bldg. Sys., Inc.,

618 F.3d 253, 267-68 (3d Cir. 2010).  In EBC, the Third Circuit compared errata sheets to

"sham" affidavits, and rejected a "one-size-fits-all" rule.  Id. at 270.  The court may accept errata

if the deponent provides persuasive reasons for why the proposed changes "truly reflect the

deponent's original testimony," or if other circumstances satisfy the court.  Id.  As compensating

measures, the court may make the original deposition available at trial for impeachment

purposes, or re-open the deposition to allow the attorney to inquire about the changes.  See id. at 267-68.  In some instances, however, such options may offer "cold comfort" to the opposing party.  Thus, the court ultimately has the discretion to refuse to consider errata altogether if the deponent fails to provide sufficient justification.  Id.

Branham's original deposition will be preserved for use as impeachment at trial, but his errata sheet may similarly be presented to the factfinder.  Unlike in Sanny or Greenway, the primary reason for many of the substantive changes to Branham's deposition is that Branham forgot or became confused about what he observed during his February 2013 inspection.  Unlike in Sanny, the unfair surprise caused by the errata sheet is lessened here because the inconsistency in Branham's recollection already exists throughout his reports.  Striking the errata sheet now could create unnecessary confusion at trial.  In the interests of fairness and in assisting the factfinder, Branham must be allowed to testify to what his complete records and memory indicate.  However, Branham must also address the inconsistencies he has created, including between his deposition and errata sheet.  As a result, Branham's original deposition will be available to ThyssenKrupp for impeachment at trial.  See, e.g., Podell v. Citicorp Diners Club, Inc., 112 F.3d 98 (2d Cir. 1997).

Several of the remaining errata make substantive changes unrelated to Branham's confusion about experiencing oscillation.  To the extent Branham attempts to adhere to his amended answers at trial, ThyssenKrupp may again impeach Branham using his original deposition.  As discussed above, the Court has declined to consider any of Branham's substantive changes for the purposes of the present motions; to do so would have improperly disadvantaged ThyssenKrupp, which sought to prevail on its present motions based on

Branham's original testimony.  EBC, 618 F.3d at 269.

In connection with its motion to strike, ThyssenKrupp also seeks an order requiring Hall to produce his correspondence with Branham.  ThyssenKrupp argues Hall's failure to immediately correct the record violated the Minnesota Rules of Professional Conduct, and that the timing of the errata sheet requires an examination of correspondence to "determine the authenticity" of the deposition changes.  Pl.'s Mem. Strike Errata Sheet [Docket No. 187] at 21. Given the ruling made in this Order regarding the errata sheet, ThyssenKrupp's request is denied.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants' Motion for Summary Judgment [Docket No. 165] is **GRANTED**.

2.  Counts 2, 3, and 4 of the Complaint [Docket No. 1] are **DISMISSED WITH PREJUDICE**.

3.  Defendants' Motion to Exclude Branham's Testimony [Docket No. 161] and La Quinta's Motion for Joinder [Docket No. 169] are **GRANTED in part**, as discussed herein.

4.  Defendants' Motion to Strike Branham's Errata Sheet [Docket No. 185] is **DENIED**.

5.  Defendants ThyssenKrupp Americas Corporation, ThyssenKrupp Elevator Capital Corporation, and ThyssenKrupp Elevator Manufacturing, Inc. are **DISMISSED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 18, 2014.